UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JUMAR HOOKS, et al.,                    :
                                        :       Case No. 1:05cv2651
            Plaintiffs,                 :
                                        :       JUDGE KATHLEEN O'MALLEY
                                        :
     v.                                 :
                                        :
SAXON MORTGAGE, INC.,                   :       OPINION AND ORDER
                                        :       COMPELLING ARBITRATION
            Defendant.                  :

        Plaintiffs Jumar Hooks ("Hooks") and Dianne Felder ("Felder") filed this putative class action

against Defendant Saxon Mortgage, Inc. ("Saxon" or "Defendant"), alleging twenty-four state and

federal claims related to their separate mortgage loans. After filing a timely answer, Defendant filed

the motion that is currently before the Court, which is a motion to compel individual arbitration, to

stay court proceedings, and to dismiss class action claims (Dkt. No. 7).  For the reasons articulated

below, the Court **GRANTS in part** and **DENIES in part** Defendant's motion.  The Court grants

Defendant's request to compel individual arbitration and stay court proceedings, and denies, as moot,

Defendant's request to dismiss class action claims.

I.      BACKGROUND

        Both Hooks and Felder have entered into separate mortgage loans with Defendant.  Hooks

entered into a loan transaction with Defendant on October 21, 1999, executing a note in the original

principal amount of $56,000, secured by an Open-End Mortgage on property owned by Hooks at

2940 East 115th Street, Cleveland, Ohio.  Felder entered into a mortgage loan transaction with

Defendant on April 5, 2001, executing a note in the original principal amount of $91,800, secured by an Open-End Mortgage on property owned by Felder at 26900 Oriole Avenue, Euclid, Ohio.  In connection with their respective loan transactions, Hooks and Felder each signed an "Arbitration Rider to the Mortgage/Deed of Trust" ("Arbitration Rider" or "Rider")  that was a separate, stand alone document.  Both Arbitration Riders contained the following provisions:

> **ARBITRATION OF DISPUTES.**  <u>All disputes, claims, or controversies arising from or related to the loan evidenced by the Note, including statutory claims, shall be resolved by binding arbitration,</u> and not by court action, except as provided under "Exclusions from Arbitration" below.  This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-4) . . . <u>All disputes subject to arbitration under this agreement shall be arbitrated individually, and shall not be subject to being joined or combined in any proceeding with any claims of persons or class of persons other than Borrower or Lender.</u>

*    *    *    *

> **NOTICE:** BY SIGNING THIS ARBITRATION RIDER YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS DESCRIBED IN THE 'ARBITRATION OF DISPUTES' SECTION ABOVE DECIDED EXCLUSIVELY BY ARBITRATION, AND YOU ARE GIVING UP ANY RIGHTS YOU MAY HAVE TO LITIGATE DISPUTES IN A COURT OR JURY TRIAL.  DISCOVERY IN ARBITRATION PROCEEDINGS IS LIMITED IN THE MANNER PROVIDED BY THIS AGREEMENT
>      <u>THIS IS A VOLUNTARY ARBITRATION AGREEMENT.  IF YOU DECLINE TO SIGN THIS ARBITRATION AGREEMENT, LENDER WILL NOT REFUSE TO COMPLETE THE LOAN TRANSACTION BECAUSE OF YOUR DECISION</u>.

2

(Hooks Arbitration Rider, Dkt. No. 7, Ex. 2) (underlining added, capitalization in original).[1]

In November 2000, Hooks filed a complaint against Defendant in the Court of Common Pleas, Cuyahoga County, Ohio, asserting, *inter alia*, a claim challenging the Arbitration Rider.  That action was settled in 2002, at which time Hooks signed a Release and Settlement Agreement in which he released all "claims, demands, rights, and causes of action of any kind . . . including . . . all claims asserted in the [suit giving rise to the settlement agreement]."  (Hooks Release and Settlement Agreement, Ex. 3 to Defendant's Motion).

Plaintiffs filed the present class action complaint ("Complaint") in the Cuyahoga County Court of Common Pleas on October 12, 2005.  The Complaint defines the putative class as follows:

> 10.  Representative Plaintiffs bring the claims herein set forth on behalf of a class consisting of all individuals who satisfy the following criteria:
>
> > a.  They are residents of the State of Ohio
> >
> > b.  Their loans were made and or serviced by Defendant at some time during the four years immediately preceding the filing of this action.
> >
> > c.  They were sent written notice that their respective mortgage loans were in default or were contacted by Defendant by telephone or other means as part of an effort by Defendant to collect such mortgage loans.

(Dkt. No. 1 at ¶ 10).

The Complaint contains allegations of a variety of predatory lending and illegal loan servicing

---

[1]  The portions of the Riders quoted in this opinion are not meant to replicate the appearance of the Riders themselves, including font size of the typewritten material in the Riders. As a general description, Plaintiffs state in their opposition brief that each Rider was "two pages long, written in type that was smaller than (12) point, contained at least nine paragraphs and was written on the front and back of one sheet of paper."  (Plaintiff's Opposition at 10)."  Regarding the provisions quoted above, the sole difference between the Arbitration Rider signed by Hooks and the one signed by Felder is that, in Felder's Rider, the first paragraph of the "NOTICE" section is typed in boldface.

3

practices, including claims under the Home Equity Protection Act ("HOEPA"), the Real Estate Settlement Procedures Act ("RESPA"), the Truth-in-Lending Act ("TILA"), the Ohio Consumer Protection Act ("OCPA"), the Fair Debt Collections Practices Act ("FDCPA"), and the Fair Credit Reporting Act ("FCRA"), as well as common law claims. Generally, Plaintiffs allege that "Defendant Saxon Mortgage, Inc., in conjunction with various mortgage originators, pursue unsophisticated borrowers such as, the Representative Plaintiffs, and entrap them with exploitive home equity loans, charge them illegal and exploitive fees, refuse to credit their payments, and then pursue foreclosure actions against them." (Dkt. No. 1 at ¶ 1). For relief, Plaintiffs seek a minimum of $500,000 per class member or "such other amounts that will be proven at trial." (Dkt. No. 1 at p. 27).

The action was removed to this Court on November 14, 2005. After filing an answer, Defendant filed the present motion seeking to compel arbitration pursuant to the Arbitration Riders signed by Hooks and Felder. In addition, Defendant asks the Court to stay court proceedings and to dismiss Plaintiff's class action claims.

## II.  ANALYSIS

### A.  Law

The Court first must determine which law governs the Arbitration Riders at issue in this case - state or federal law. Defendant argues that the Riders are governed by the Federal Arbitration Act ("FAA"), and Plaintiffs argue that the Riders are governed by Ohio Revised Code § 2711.03. Although Plaintiffs do not point to any differences between the FAA and Ohio law or argue that there are material differences between the two laws, the Court will first determine which law applies.

Where the FAA applies, it preempts state law. *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 272 (1995) (citing *Southland Corp. v. Keating*, 465 U.S. 1 (1984)). The FAA applies

4

to arbitration agreements in contracts or transactions "involving commerce." 9 U.S.C. § 2; *see also Guiness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, 472 (2d Cir. 1980) ("Federal law applies to enforcement of a duty to arbitrate, whenever interstate commerce is involved."). The term "involving commerce" has been held to be as broad as Congress' full commerce power. *Dobson*, 513 U.S. at 273-74. In this case, the Riders themselves provide that "[t]his arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-4)." (*See, e.g.,* Hooks Arbitration Rider, Dkt. No. 7, Ex. 2). In addition, the transactions involved loans between a Virginia corporation and Ohio residents. The transactions, therefore, involved interstate commerce, and the Arbitration Riders at issue in this case are governed by the FAA.

The FAA provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Further, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration . . ." 9 U.S.C. § 4.

Section 2 of the FAA, quoted above, is "a congressional declaration of a liberal federal policy favoring arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 24 (1983). The purpose of the FAA was "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane*

5

*Corp.*, 500 U.S. 20, 24 (1991) (citations omitted); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985) ("[T]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, a concern which requires the we rigorously enforce agreements to arbitrate.") (quotations omitted).

Although arbitration is generally favored, the initial "question of arbitrability" of a dispute is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quotations omitted). Thus, there are limited instances in which the court assumes that the parties intended the court, rather than an arbitrator, to decide a particular matter. *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452 (2003). These limited instances "include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Id.*

Accordingly, in order to determine whether a dispute must be arbitrated under the FAA, the following questions, when raised, are for the court to decide: (1) whether a valid agreement to arbitrate exists; and (2) whether the dispute in question falls within the scope of that agreement. *Bazzle*, 539 U.S. at 452. "[I]t is well established that any doubts regarding arbitrability should be resolved in favor of arbitration." *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005). In addition, where, as here, federal statutory rights are at issue, the Court should consider "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Soler Chrysler-Plymouth, Inc.*, 473 U.S. at 628. In other words, a party should be held to a valid arbitration agreement that covers a dispute "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.*

As to the gateway question of whether a valid agreement to arbitrate exists, "[a]n arbitration agreement may be voided for the same reasons for which any contract may be invalidated, including forgery, unconscionability, and lack of consideration." *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 450 (6th Cir. 2005). This analysis requires application of ordinary state-law contract principles. *Id.* Neither party explicitly addresses the question of which state law should apply, but both cite Ohio case law in their briefs. The Court, accordingly, applies Ohio contract law in determining whether the Arbitration Riders are valid agreements. When applying state law, however, "due regard must be given to the federal policy favoring arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 475-76 (1989).

### B.    Discussion

Defendant argues that the Arbitration Riders are valid agreements to arbitrate because they clearly and explicitly provide that Plaintiffs, by signing the agreements, were waiving their rights to litigate, in a court or jury trial, any disputes arising out of the loan transactions. Further, Defendant contends that the Riders are valid and enforceable because they clearly provide that Plaintiffs' loans were not contingent upon signing the Riders, i.e., that Hooks and Felder could have chosen not to sign the Arbitration Riders and still obtained their loans. As to Hooks, Defendant argues that Hooks also released his right to challenge the Arbitration Riders when he signed the 2002 Release and Settlement Agreement that resulted from his previous litigation against Defendant. Defendant also contends that the claims asserted by Hooks and Felder clearly fall within the scope of the Arbitration Riders. According to Defendant, all of Plaintiffs' allegations arise from or are related to their respective loans, and, as such, are covered by the Riders.

In response, Plaintiffs challenge the validity of the Arbitration Riders, arguing primarily that

7

they are unconscionable. Plaintiffs claim that they did not have time to carefully read the contracts, they were never given copies of the original loan papers after they were signed, the agreements are contracts of adhesion, and the font and format of the agreements weighs against their enforceability. In addition, Plaintiffs argue that they did not knowingly, voluntarily, and intelligently waive their right to a jury trial. Significantly, Plaintiffs do <u>not</u> challenge whether their claims fall within the scope of the Arbitration Riders, nor do they challenge whether arbitration agreements that preclude <u>class</u> arbitration are enforceable. Plaintiffs devote nearly half of their opposition brief to the argument that courts, not arbitrators, should decide gateway questions of arbitrability such as the validity of an arbitration agreement. Defendant does not disagree that the Court should decide those threshold questions, and, indeed, the Supreme Court has already resolved the issues that Plaintiffs address.[2]

The Court addresses the parties' arguments within the framework laid out at the beginning of this opinion, analyzing (1) the validity of the agreement, (2) whether the claims in dispute fall within the scope of the Arbitration Riders, and (3) whether legal constraints external to the parties' agreement forecloses the arbitration of their claims. In addition, although not argued by Plaintiffs, the Court briefly addresses the enforceability of an arbitration agreement that precludes class

---

[2] In fact, over six pages of Plaintiffs' opposition brief was taken verbatim, <u>without citation</u>, from an amicus brief filed with the United States Supreme Court when those issues of arbitrability were being considered by the Supreme Court in *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002). *See* Brief of *Amici Curiae* Trial Lawyers for Public Justice and AARP (May 28, 2002). Although those arguments were timely when they were before the Supreme Court in *Howsam*, they are simply inapplicable in the present case because they address questions that are not at issue here. The Court is at a loss to determine which is worse: that Plaintiffs wasted half of their brief on issues that are not disputed while neglecting to address more significant questions (such as the enforceability of an arbitration agreement that precludes class arbitration), that Plaintiffs did not even bother changing the font and spacing of the copied portions to match the rest of their opposition brief, or that Plaintiffs attempted to pass the work off as their own by failing to include any citation to the amicus brief and changing words like "amici" to "consumers."

arbitration.

### 1.    Validity of the Arbitration Riders

Plaintiffs raise a variety of arguments to resist arbitration that arguably fall within the category of attacking the validity of the Arbitration Riders.  Those arguments are addressed in turn below.

Plaintiffs first argue that the Arbitration Riders are ambiguous and contradictory, and thus unenforceable, because of the following language: "no provision of, nor the exercise of any rights under this Arbitration Rider shall limit the right of a party during the pendency of any claim, to seek and use ancillary or preliminary remedies, judicial or otherwise."  (Opp. Br. at 7-8).  As Defendant points out, however, no such language appears in either the Hooks or Felder Arbitration Rider.  Plaintiffs do not attack the language that is actually contained in the Riders; rather, they appear to have invented language that does not appear in the Riders (or adopted it from another case where such language <u>was</u> employed), attributed it to the Riders, and used it to argue that the non-existent language renders the Riders ambiguous.  Obviously, Plaintiffs' argument on this point must be rejected.

In addition, the language that actually does appear in the Riders is neither ambiguous nor contradictory.  Both Riders contained the following, clear notice directly preceding the signature line:

> **NOTICE:** BY SIGNING THIS ARBITRATION RIDER YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS DESCRIBED IN THE 'ARBITRATION OF DISPUTES' SECTION ABOVE DECIDED EXCLUSIVELY BY ARBITRATION, AND YOU ARE GIVING UP ANY RIGHTS YOU MAY HAVE TO LITIGATE DISPUTES IN A COURT OR JURY TRIAL.

(Hooks Rider, Dkt. No. 7, Ex. 2; Felder Rider, Dkt. No. 7, Ex. 5).   Plaintiffs' argument that the Riders are ambiguous, therefore, is not persuasive.

Plaintiffs also argue that they did not knowingly, voluntarily, and intelligently waive their right

9

to a jury trial.  To the extent that this argument is related to Plaintiffs' contention that the Riders are ambiguous, that argument must fail for the reasons just stated.  To the extent that it is an independent argument, it is without support and must be rejected.  As the Sixth Circuit has noted, "the loss of a right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate." *Cooper v. MRM Investment Co.*, 367 F.3d 493, 506 (6th Cir. 2004) (citations omitted).  Even if the Riders at issue in this case had not so clearly and explicitly explained that, by signing the agreement, "you are giving up any rights you may have to litigate disputes in a court or jury trial," it would likely still constitute a valid waiver of the signer's Seventh Amendment right to a jury trial.  Plaintiffs have put forward no evidentiary support for their claim, and, absent some basis for arguing that they did not knowingly, voluntarily, and intelligently waive their rights, the Court cannot accept their bare assertion.

Next, Plaintiffs argue that the agreements are unconscionable because they did not have time to carefully read the contracts, they were never given copies of the original loan papers after they were signed, the agreements are contracts of adhesion, and the font and format of the agreements weighs against their enforceability.  In response, Defendant argues that the terms of the agreements are commercially reasonable, that failure of a party to read an agreement does not invalidate it, and that Plaintiffs had a meaningful choice not to sign the Riders because the Riders expressly stated that the loans were not contingent on the borrower agreeing to arbitration.

Under Ohio law, the doctrine of unconscionability consists of two prongs: "(1) substantive unconscionability, i.e., unfair and unreasonable contract terms, and (2) procedural unconscionability, i.e., individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Matthews v. New Century Mortgage Corp.*, 185 F.Supp.2d 874,

10

892 (S.D. Ohio 2002) (citing *Jeffrey Mining Prod., L.P. v. Left Fork Mining Co.*, 143 Ohio App. 3d 708 (Ohio Ct. App. 2001). Plaintiffs appear only to argue that the agreements were procedurally unconscionable, in that they complain that the circumstances surrounding the formation of the agreements were not indicative of a voluntary meeting of the minds. The Court does not find Plaintiffs' argument to be well-taken, and concludes that the Arbitration Riders are not unconscionable.

  Most significantly, the Riders both clearly state - directly above the signature line – that:

  THIS IS A VOLUNTARY ARBITRATION AGREEMENT.  IF YOU DECLINE
  TO SIGN THIS ARBITRATION AGREEMENT, LENDER WILL NOT REFUSE
  TO COMPLETE THE LOAN TRANSACTION BECAUSE OF YOUR DECISION.

(Hooks Rider, Dkt. No. 7, Ex. 2; Felder Rider, Dkt. No. 7, Ex. 5). The Riders, therefore, were not adhesive in nature, and Plaintiffs did have a meaningful choice to refuse to agree to arbitration. It is true, moreover, that failure to "carefully" read a contract does not permit a party to be free from its terms. *See ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503 (1998) ("The legal and common-sensical axiom that one must read what one signs survives this case. To find [otherwise] would destroy that standard."). In addition, the Court does not find that the font or format of the Riders compels a conclusion that they are unconscionable. The Riders were separate agreements that only included a page and a half of text. The most important portion of the Riders – from the perspective of an unconscionability analysis – is the portion explaining that the borrower is giving up his right to litigation before a court or jury, and that receiving the loan is not contingent upon signing the Rider. That portion appears conspicuously in all capital letters directly preceding the signature line on both Riders. Given those facts, the Court does not find that the Arbitration Riders are unconscionable.

11

Perhaps Plaintiffs' most compelling argument is that they were hurried and pressured through the process of signing the agreements.  If true, that argument lends weight to Plaintiffs' contention that the Riders were procedurally unconscionable.  Plaintiffs, however, have not put forward any evidence, not even an affidavit, to support their assertion that they were indeed rushed through signing the agreements.  Plaintiffs do not even describe how long they were given to read the agreements, under what conditions they reviewed them, or what sort of pressure was applied.  *Compare Brennan v. Bally Total Fitness*, 198 F.Supp.2d 377, 383 (S.D.N.Y. 2002) (finding an arbitration agreement unenforceable where employer gave employee only fifteen minutes to read a sixteen-page document and threatened that the employees who did not sign the agreement would not be promoted).  Given the other factors weighing in favor of finding that the Arbitration Riders are enforceable, the Court cannot rely only on Plaintiffs' bare assertions to invalidate these agreements.  Indeed, even the time it would take to sign one's name on these Riders would permit a borrower to read the capitalized text just four lines above the signature line which reads "THIS IS A VOLUNTARY ARBITRATION AGREEMENT."  Because of the clarity and placement of the text informing borrowers that the agreement was a voluntary waiver of their right to litigate, Plaintiffs' arguments as to procedural unconscionability, without more, are unpersuasive.

Plaintiffs also argue that they are entitled to a full evidentiary hearing and a jury trial on the issue of the validity of the Arbitration Riders.[3]  In so requesting, Plaintiffs cite to § 4 of the FAA.  An examination of the language of the FAA, therefore, is required to assess whether Plaintiffs are entitled to a hearing and/or jury trial.  The FAA, in relevant part, provides that:

---

[3]  Plaintiffs claim that they "have filed a motion requesting a full evidentiary hearing."  (Pl. Opp. at 3).  A review of the docket reveals no such motion has been filed.  The Court, however, treats this statement as a request for such a hearing.

12

> The court shall hear the parties, and upon being satisfied that the making of the
> agreement for arbitration or the failure to comply therewith is not in issue, the court
> shall make an order directing the parties to proceed to arbitration in accordance with
> the terms of the agreement . . . If the making of the arbitration agreement . . . be in
> issue, the court shall proceed summarily to trial thereof. . . Where such an issue is
> raised, the party alleged to be in default may . . . demand a jury trial of such issue, and
> upon such demand the court shall make an order referring the issue or issues to a jury.

9 U.S.C. § 4 (emphasis added).  This portion of the FAA raises two questions relative to Plaintiffs'

contention that they are entitled to a hearing and/or a jury trial.  The first is whether the phrase, "[t]he

court shall hear the parties," requires the court to hold a hearing in deciding whether the making of

an arbitration agreement is in issue.  The second question is under what circumstances should "the

making of an agreement for arbitration" be considered to be "in issue," such that a trial is necessary

to resolve issues of the "making" of the agreement.

    The answer to the first question is not difficult.  The Sixth Circuit has held that "[t]he

language in § 4 [of the FAA], 'The court shall hear the parties . . .' does not require an evidentiary

hearing."  *Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.*, 706 F.2d 155, 159 (6th Cir. 1983).

Indeed, submission of briefs on the issue of arbitrability appears to satisfy that provision of the FAA.

*See id.* at 159 (finding that the district court did not err in declining to hold an evidentiary hearing and

noting that"[t]he parties had a hearing in that their attorneys presented their arguments on the issue

of arbitrability on the Shaw claim.").  While the FAA certainly permits a court to hold a hearing, the

Court is not required to do so.

    When the "making of the agreement for arbitration" is "in issue" is less clear.  Although

neither party cites any Sixth Circuit cases that are on point, most courts appear to require a party

resisting arbitration to produce at least some evidence that calls into question the making of the

13

agreement before that party is entitled to a jury trial.  In *American Heritage Life Insurance Company v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002), the Fifth Circuit stated that "it is well-established that a party to an arbitration agreement cannot obtain a jury trial merely by demanding one." (citing *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992).  Further, the *Orr* Court stated that a party contesting the making of an arbitration agreement must "produce some evidence to substantiate his factual allegations."  *Id*. (citing *Dillard*, 961 F.2d at 1154).  In *Orr*, the parties challenging the arbitration agreement made allegations of procedural and substantive unconscionability and produced affidavits claiming that they did not understand the agreement, and that the agreements had not been explained to them.  *Id*.  The Court found that the appellants were not entitled to a jury trial based on that showing, stating that:

> Other than their self-serving affidavits, Appellants have not submitted a whisper of evidence to support the conclusion that a jury trial is warranted under § 4 of the FAA. Raising issues of the Agreements' procedural or substantive unconscionability, as Appellants have in the instance case, is not the equivalent of questioning the "making" of an arbitration agreement.

*Id.*

The Third Circuit applies a similar standard, explaining that "a naked assertion" by a party that he did not intend to be bound by an arbitration agreement is not sufficient to put the making of the agreement in issue, but an "unequivocal denial that the agreement had been made, accompanied by supporting affidavits," would usually be sufficient to require a jury trial.  *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980).  Other courts take a similar approach. *See, e.g., Alamacenes Fernandez, S.A., v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945) ("To make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made was needed, and some evidence should have been produced to substantiate that denial.").

14

In the present case, Plaintiffs are not entitled to a jury trial on the making of the Arbitration Riders.  They have made only "naked assertions" that the Riders are unconscionable, which cannot be considered the equivalent of questioning the making of the Riders for purposes of § 4 of the FAA.  Further, although Plaintiffs seem to deny that existence of the agreements in some portions of their opposition brief, they have not done so unequivocally.  On one page, for example, they state that "Plaintiffs doubt whether such an agreement to arbitrate exists and is [sic] skeptical to proceed with any dealings with the Defendants without the protection of the court."  (Opp. Br. at 2).  On another page, Plaintiffs write that "[t]he Defendants must realize that the Plaintiffs do not deny the rider only its validity."  (Opp. Br. at 6).  Plaintiffs' position on this issue is ambiguous at best.  Regardless, however, they have not submitted any evidence that might support their assertions.  The Court, therefore, finds that Plaintiffs are not entitled to an evidentiary hearing or a jury trial on the validity of the Arbitration Riders.

Based on the foregoing, the Court concludes that the Arbitration Riders are valid and enforceable agreements within the meaning of Ohio contract law.  In addition, Plaintiffs have failed to put forward any evidence that would entitle them to a hearing or jury trial on the issue of agreement validity.[4]

### 2.    Scope of the Arbitration Riders

Another gateway question that is for the court to decide, rather than an arbitrator, is whether

---

[4]  The Court does not address whether Hooks is foreclosed from challenging the validity of the Arbitration Rider by the terms of the Release and Settlement Agreement he signed in 2002.  Although it appears that he waived his right to challenge the Rider in that Agreement, the question is moot because the Court has already determined that the Riders are valid.  In any event, the terms of Felder's Rider are identical and require the Court to conduct the same analysis, regardless of whether Felder alone has challenged her Rider or whether both Hooks and Felder contest their respective Riders.

15

the dispute between the parties falls within the scope of the arbitration agreement.  As noted above, Plaintiffs do <u>not</u> argue that their claims are outside the scope of the Arbitration Riders in this case.  There appears, therefore, to be no disagreement about this issue, and the Court need not address it in detail.  *See Howsam*, 537 U.S. at 84 ("a <u>disagreement</u> about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court." (emphasis added)).  The Riders in this case are broad, applying to "[a]ll disputes, claims, or controversies arising from or related to the loan evidenced by this Note."  (Hooks Rider, Dkt. No. 7, Ex. 2; Felder Rider, Dkt. No. 7, Ex. 5).  Absent an argument to the contrary, the Court agrees with Defendant that all of Plaintiffs' claims arise from the loan transaction between Plaintiffs and Defendant, which falls squarely within the broad scope of the Arbitration Riders.

### 3.      External Legal Constraints

In addition, where, as here, federal statutory rights are at issue, the Court should consider "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims."  *Soler Chrysler-Plymouth, Inc.*, 473 U.S. at 628.  Essentially, that question is whether "Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."  *Id.*  The Supreme Court has held that "the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue."  *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000) (citations omitted).

In the present case, Plaintiffs do not argue that Congress intended to preclude arbitration of the statutory claims he raises.  As such, they have failed to meet their burden with respect to this issue, and the Court concludes that Congressional intent does not preclude the arbitration of

16

Plaintiffs' claims.

### 4.    Class Arbitration

Lastly, the Court examines whether the provision in the Arbitration Riders that prohibits borrowers from bringing claims through any sort of class mechanism, either by class action or by class arbitration, renders the Riders unenforceable. Following is the provision in the Riders that bars class mechanisms:

> All disputes subject to arbitration under this agreement shall be arbitrated individually, and shall not be subject to being joined or combined in any proceeding with any claims of persons or class of persons other than Borrower or Lender.

(Hooks Rider, Dkt. No. 7, Ex. 2; Felder Rider, Dkt. No. 7, Ex. 5).

Defendant argues that such a provision should be enforced in this context. Plaintiffs make no attempt to argue that an arbitration agreement that prohibits class actions or class arbitration renders it unenforceable. The Court, therefore, only briefly addresses this issue, which appears to be a matter of first impression in this circuit.

Although the Sixth Circuit has not addressed this precise issue,[5] Defendant cites cases from other federal circuit courts that have enforced contractual provisions to arbitrate claims, including TILA claims, even though the arbitration provision barred class action procedures. *See Randolph v. Green Tree Financial Corp.-Ala.*, 244 F.3d 814, 816-19 (11th Cir. 2001); *see also Johnson v. W. Suburban Bank*, 225 F.3d 366, 369 (3d Cir. 2000) ("because we can discern no congressional intent

---

[5]  In *Burden v. Check into Cash of Kentucky, LLC*, 267 F.3d 483, 492 (6th Cir. 2001), the Sixth Circuit noted in dicta that "[a]s to Plaintiff's waiver of statutory class action rights, it is Plaintiff's burden to show that Congress intended such rights to be nonwaivable, a burden that the Eleventh Circuit recently found has not been met under the TILA." (citing *Randolph v. Green Tree Financial Corp.-Ala.*, 244 F.3d 814 (11th Cir. 2001). The Sixth Circuit did not resolve the issue directly, however, stating that "[w]e set out this precedent as an indication of the limited prospects such claims ultimately face [on remand]." *Id.*

to preclude the enforcement of arbitration clauses in either [the Truth in Lending Act's or the Electronic Fund Transfer Act's] text, legislative history, or purpose, we hold that such clauses are effective even though they may render class actions to pursue statutory claims under [the statutes] unavailable.").  Courts examining TILA claims, specifically, have noted that prohibiting class procedures does not prevent plaintiffs from vindicating their statutory rights under TILA because: (1) although Congress recognized that class actions were important to the enforcement of TILA, it did not provide an absolute right to them, *Randolph*, 244 F.3d at 817 (citation omitted); (2) to the extent that class actions serve public interest goals, TILA provides for enforcement by federal agencies that would meaningfully deter violations, *Johnson*, 225 F.3d at 369; and (3) the availability of attorneys fees under TILA will not cause individual arbitration to "choke off the supply of lawyers" willing to pursue claims on behalf of individual debtors, *Johnson*, 225 F.3d at 374.

In this case, Plaintiffs bring, *inter alia*, TILA claims.  Absent an argument to the contrary, the reasoning employed in the cases cited above appears to apply equally to the Plaintiffs' TILA claims in this case.  Although it is not clear whether the unavailability of class mechanisms will prevent Plaintiffs from vindicating their statutory rights under the other statutes upon which Plaintiffs base their claims, Plaintiffs have not argued that would prevent vindication of their rights.  It is not the Court's function to scour the provisions and legislative history of the nine federal and state statutes upon which Plaintiffs base their claims in order to construct arguments in Plaintiffs' favor, and the Court declines to undertake that task.

The Court also notes that the factors that other courts have relied on to find class bans unenforceable are not present in this case.  For example, in *Kristian v. Comcast Corp.*, 446 F.3d 25, 53-55 (1st Cir. 2006), the First Circuit found an arbitration agreement's class mechanism ban was

18

invalid in the context of plaintiffs' state and federal antitrust claims, reasoning in part that the complexity and cost of antitrust suits would make it unfeasible for plaintiffs to proceed on an individual basis.  In that case, the plaintiffs provided expert affidavits detailing the costs of antitrust litigation and demonstrating that, absent some form of class mechanisms, a consumer antitrust plaintiff would not sue at all.  *Id.* at 58.  In the case at bar, those considerations have not been raised and likely are not present.

For those reasons, the Court finds that the prohibition on class arbitration in the Arbitration Riders is enforceable.  In accordance with those provisions, the parties are directed to go to individual arbitrations.

## III.    CONCLUSION

For the reasons outlined above, Defendant's motion is **GRANTED in part** and **DENIED in part**.  Defendant's motion pertaining to its request to compel arbitration and to stay court proceedings is **GRANTED**, and Defendant's motion pertaining to its request to dismiss Plaintiffs' class action claims is **DENIED** as moot.  The Court **DIRECTS** the parties to proceed to individual arbitration in accordance with the terms of the Arbitration Riders.  This case is also hereby **STAYED** pursuant to 9 U.S.C. § 3.  Because none of Plaintiffs' claims remain active, having been compelled to be resolved through arbitration, this case is hereby **CLOSED**, subject to reopening by written motion of either party at the conclusion of the arbitration proceedings.


IT IS SO ORDERED.

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

19

**Dated: June 20, 2006**